136 P.3d 639 (2006)
2006 OK 31
The BOARD OF COUNTY COMMISSIONERS OF MUSKOGEE COUNTY, Plaintiff/Appellee,
v.
Edward L. LOWERY and Mary L. Lowery, Husband and Wife, Defendants/Appellants and
Rural Water District No. 5, and the Muskogee County Treasurer, Defendants.
The Board of County Commissioners of Muskogee County, Plaintiff/Appellee,
v.
Jack E. Whitten and Doris M. Whitten, Husband and Wife, Defendants/Appellants and
Rural Water District No. 5, and the Muskogee County Treasurer, Defendants.
The Board of County Commissioners of Muskogee County, Plaintiff/Appellee,
v.
Richard Hyslope, Defendant/Appellant and
The Farm Credit Bank of Wichita Rural Water District No. 5, and the Muskogee County Treasurer, Defendants.
The Board of County Commissioners of Muskogee County, Plaintiff/Appellee,
v.
Paul Hobbs and Diann Hobbs, Husband and Wife, Defendants/Appellants and
Mary Murl Barrett, Bank of Cherokee County, Rural Water District No. 5, and the Muskogee County Treasurer, Defendants.
Nos. 98,361, 98,362, 98,363, 98,531.
Supreme Court of Oklahoma.
May 9, 2006.
C. Bart Fite of Wright, Stout, Fite & Wilburn, Muskogee, OK, Mark James Caywood of Mark James Caywood, P.L.L.C., Oklahoma City, OK, for Plaintiff/Appellee, County.
Harlan Hentges of Mulinix, Ogden, Hall, Andrews, & Ludlum, Oklahoma City, OK, for Defendants/Appellants, Landowners.
Stephen J. Scherer of Muskogee, OK, for Defendants/Appellants, Landowners Edward L. Lowery and Mary L. Lowery.
Jo Nan Allen of Tahlequah, OK, for Defendants/Appellants, Landowners Paul Hobbs and Diann Hobbs.
Tina Jordan of Tahlequah, OK, for Defendants/Appellants, Landowners Paul Hobbs and Diann Hobbs.
Eric J. Groves of Groves & Associates, Oklahoma City, OK, for The Institute for Justice, Amicus Curiae.
Dana Berliner of The Institute for Justice, Washington, DC, admitted pro hac vice, for The Institute for Justice, Amicus Curiae.
Daniel P. Muino of Gibson, Dunn & Crutcher LLP, San Francisco, CA, admitted pro hac vice, for The Institute for Justice, Amicus Curiae.
*642 LAVENDER, J.
¶ 1 The issues in the present cause are as follows: (1) whether the County's exercise of eminent domain in the instant cases is for public use in accordance with Article 2, § 23 and Article 2, § 24 of the Oklahoma Constitution and (2) whether the County's taking for purposes of economic development of Muskogee County constitutes "public purposes" within the meaning of 27 O.S.2001 § 5 to support such a taking.

I

FACTS AND PROCEDURAL HISTORY
¶ 2 Plaintiff/Appellee County initiated condemnation proceedings against Defendant/Landowners[1] for the purpose of acquiring temporary and permanent right-of-way easements for the installation of three water pipelines. Two of the proposed water pipelines (referred to by the parties and hereinafter collectively referred to as "the Eagle Pipeline") would solely serve Energetix, a privately owned electric generation plant, which was proposed for construction in Muskogee County. By way of the Eagle Pipeline, Energetix's proposed operations would require a maximum of 8,000,000 gallons of water daily for use in cooling towers associated with the operation of an 825 megawatt natural gas-fired power plant. The Eagle Pipeline would extend from the plant site to the Arkansas River with one of the two pipelines designated for carrying water to the plant and the other pipeline designated for return of the water to the Arkansas River.
¶ 3 Energetix proposed to build the third water pipeline (hereinafter "the Water District *643 Pipeline") on behalf of the Rural Water District No. 5 (hereinafter "Water District")[2] pursuant to a contract entitled "Rural Water District Number 5, Muskogee County: Water Pipeline Construction Agreement,"[3] which expressly provided for Energetix's agreement to build this pipeline at no cost to the Water District "as part of the consideration to induce certain property owners to grant private easements for the Eagle Pipeline." The Water District Pipeline was intended to serve residents of the Water District who were not currently being served and to enhance current water service to residents of the Water District, who were receiving it. This contract expressly specified that Energetix's duty to construct the Water District pipeline arises only on the conditions precedent that Energetix first succeeds in obtaining all rights-of-way needed to construct the private Eagle Pipeline and Energetix begins construction of the Eagle Pipeline.[4] Under the terms of this contract, the Water District would be responsible for supplying the necessary materials for construction of the pipeline, but Energetix would pay all construction costs. Energetix additionally contracted to provide and install up to six (6) fire hydrants at its expense during the construction of the Eagle Pipeline and the Water District Pipeline (with Energetix's duty to construct the hydrants likewise tied to the same conditions precedent above).
¶ 4 Landowners filed an answer and counterclaim in each case seeking declaratory and injunctive relief on the basis that the County's proposed taking was an unlawful taking of private property for private use and private purpose of the private company, Energetix, in violation of 27 O.S.2001 § 5 and the eminent domain provisions contained within both the Oklahoma Constitution and the U.S. Constitution.
¶ 5 County filed a motion to strike Landowners' answer and counterclaim on the basis that Landowners failed to comply with the statutory procedure applicable to condemnation proceedings. The Report of Commissioners[5] was thereafter filed, which provided *644 the takings were for a public purpose and established the amount of just compensation to be awarded to Landowners for their respective properties.[6] Landowners filed their respective Exceptions to the Commissioners' Report,[7] objecting primarily on the basis that the takings were not for a valid public purpose, but rather an unlawful taking of private property for private purpose.
¶ 6 The trial court ultimately agreed with the County and entered an Order confirming the takings in these cases. The trial court's order further provided the County properly exercised the power of eminent domain pursuant to 27 O.S. § 5 in furtherance of the following public purposes: 1) enhancing the economic development of Muskogee County; 2) providing for temporary and permanent jobs for Muskogee County residents; and 3) for the operation of a pipeline to be used in conjunction with the construction of an electricity generation plant to be owned and operated by a private company and located in Muskogee County. Additionally, the trial court order concluded "the land acquired is necessary for the installation and maintenance of certain water lines. These water lines are necessary for the private electricity generation plant to operate, for the benefit of Muskogee County residents and the general public." The trial court determined that this order affected a substantial part of the merits of the controversy and certified the matter for immediate appeal pursuant to 12 O.S. 2001 § 952(b)(3).
¶ 7 Landowners appealed, and the COCA reversed and remanded the trial court's determination with instructions to enter a judgment sustaining Landowners' Exceptions to the Commissioners' Report on the basis that the takings in the instant cases were unlawful in that they were for the direct benefit of a private company and not for "public purposes" as required for the County's exercise of condemnation pursuant to 27 O.S.2001 § 5. The COCA reached its determination primarily *645 upon the conclusion that the economic development or enhancement of a community fails to meet the statutory "public purposes" requirement to support the County's exercise of eminent domain in these cases.
¶ 8 County filed its Petition for Certiorari, arguing that the COCA incorrectly determined that the County's exercise of eminent domain for the purpose of economic development does not constitute "public purpose" under Art. 2, § 24 of the Oklahoma Constitution. Landowners' Answer to the Petition for Certiorari urged the correctness of the COCA opinion, noting the COCA reached its determination solely on statutory grounds. Upon Landowners' showing of good cause for the filing of additional briefs on certiorari, we ordered the parties to submit supplemental briefs on certiorari.[8] Additionally, we granted the Institute for Justice leave to file a brief amicus curiae and heard oral argument en banc.

II

THE LAW APPLICABLE TO THIS CONDEMNATION PROCEEDING

The Oklahoma General Eminent Domain Statute and Constitutional Eminent Domain Provisions
¶ 9 The County sought to condemn Landowners' private property pursuant to its general eminent domain power granted by 27 O.S.2001 § 5, which provides as follows:
Any county, city, town, township, school district, or board of education, or any board or official having charge of cemeteries created and existing under the laws of this state, shall have power to condemn lands in like manner as railroad companies, for highways, rights-of-way, building sites, cemeteries, public parks and other public purposes.

Id. (emphasis added). Additionally, we are guided by the applicable general federal constitutional[9] and state constitutional eminent domain provisions, including and perhaps most notably our special provision concerning the taking of private property. Article 2, § 23 provides as follows:
No private property shall be taken or damaged for private use, with or without compensation, unless by consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining, or sanitary purposes, in such manner as may be prescribed by law.
OKLA. CONST. art. 2, § 23. Our Constitution further generally provides "private property shall not be taken or damaged for public use without just compensation." OKLA. CONST. art. 2, § 24. That constitutional provision additionally states "[in] all cases of condemnation of private property for public or private use, the determination of the character of the use shall be a judicial question." Id. The law is clear that "[p]rivate property may not be taken or damaged by the condemning agency unless the taking or damage is necessary for the accomplishment of a lawful public purpose." Luccock v. City of Norman, 1978 OK 66, 578 P.2d 1204, 1206 (citing Art. 2, §§ 23 & 24 of the Oklahoma Constitution).[10]Luccock demonstrates that *646 we have used the terms "public use" and "public purpose" interchangeably in our analysis of our state constitutional eminent domain provisions, and we therefore view these terms as synonymous. See id.; see also Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954)(noting the narrow role of the judiciary in determining whether the power of eminent domain is being exercised for a "public purpose" in a case construing a federal statute containing the term "public use"); Kelo v. City of New London, 545 U.S. 469, ___, 125 S.Ct. 2655, 2662, 162 L.Ed.2d 439 (2005) (explaining that in its application of the Fifth Amendment to the States at the close of the 19th Century, the U.S. Supreme Court rejected the "use by the public test" and "embraced a broader and more natural interpretation of public use as public purpose").

The Constitutional Limitations and the Framers' Intent
¶ 10 It is settled law that the constitutional eminent domain provisions "are not grants of power, but limitations placed upon the exercise of government power." City of Pryor Creek v. Pub. Serv. Co., 1975 OK 81, 536 P.2d 343, 345 (citation omitted). The constitutional limitations on the power of eminent domain "serve to protect `the security of Property,' which Alexander Hamilton described to the Philadelphia Convention as one of the `great ob[jects] of Gov[ernment].'" Kelo v. City of New London, 545 U.S. 469, ___, 125 S.Ct. 2655, 2671, 162 L.Ed.2d 439 (2005) (O'Connor, J., dissenting) (alteration in original) (quoting 1 Records of the Federal Convention of 1787, p. 302 (M. Farrand ed., 1934)). The framers of the Oklahoma Constitution likewise recognized "that to protect both life and property is the first duty of government." ALBERT H. ELLIS, A HISTORY OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF OKLAHOMA, p. iv. (Introduction and Endorsement by William H. Murray, President of the Constitutional Convention) (1923). In keeping with these principles, we have determined the government's power of eminent domain "lies dormant in the state until the Legislature by specific enactment designates the occasion, modes and agencies by which it may be placed in operation." City of Pryor Creek, 536 P.2d at 345-46. A governmental body subordinate to the state (i.e., local governments such as a city, town, municipality or county) may not exercise, create, extend or expand a power of eminent domain in the absence of statutory authority. Id.; City of Midwest City v. House of Realty, Inc., 2004 OK 56, ¶ 19, 100 P.3d 678, 685.

"Public Purpose" in the Context of Eminent Domain
¶ 11 In determining whether economic development alone[11] constitutes a "public purpose" within the meaning of 27 O.S. § 5, as a starting point, we are guided by the longstanding general rule of strict statutory construction of eminent domain statutes. See City of Cushing v. Gillespie, 1953 OK 121, 256 P.2d 418. Further, as a general rule, we construe our state constitutional eminent domain provisions "strictly in favor of the owner and against the condemning party." Stinchcomb v. Oklahoma City, 1921 OK 154, 198 P. 508, 508 (First Syllabus by the Court). Additionally, Oklahoma eminent domain statutes must conform to the restrictions placed on the exercise of such power by the Oklahoma constitutional eminent domain provisions. See Allen v. Transok Pipe Line Co., 1976 OK 53, 552 P.2d 375. Since we must strictly construe the term "public purpose" as set forth in the applicable eminent domain statute, we acknowledge *647 the distinction of our construction of that term outside the context of eminent domain and specifically in the context of constitutional provisions restricting the use of public funds to expenditures for public purpose. See State ex rel. Brown v. City of Warr Acres, 1997 OK 117, ¶ 18, 946 P.2d 1140, 1144 (determining the term "public purpose" "should not be construed `in a narrow or restrictive sense.'") (citations omitted).[12] We adhere to the strict construction of eminent domain statutes in keeping with our precedent, mindful of the critical importance of the protection of individual private property rights as recognized by the framers of both the U.S. Constitution and the Oklahoma Constitution. If we were to construe "public purpose" so broadly as to include economic development within those terms, then we would effectively abandon a basic limitation on government power by "wash[ing] out any distinction between private and public use of propertyand thereby effectively delet[ing] the words `for public use' from [the constitutional provisions limiting governmental power of eminent domain.]" Kelo v. City of New London, 545 U.S. 469, ___, 125 S.Ct. 2655, 2671, 162 L.Ed.2d 439 (2005) (O'Connor, J., dissenting). In our view, the power of eminent domain should be exercised with restraint[13] and we therefore construe the term "public purpose" narrowly specifically in this context.

III

AS A MATTER OF OKLAHOMA CONSTITUTIONAL AND STATUTORY LAW, ECONOMIC DEVELOPMENT ALONE IS NOT A PUBLIC PURPOSE TO JUSTIFY THE EXERCISE OF COUNTY'S POWER OF EMINENT DOMAIN.
¶ 12 The County's primary argument is that the general eminent domain statute, 27 O.S. § 5 authorizes its exercise of eminent domain for the sole purpose[14] of *648 economic development (i.e., increased taxes, jobs and public and private investment in the community) because economic development constitutes a "public purpose" within the meaning of the statute as well as the state constitutional eminent domain provisions found in Art. 2, §§ 23 & 24 of the Oklahoma Constitution.[15]
*649 ¶ 13 In arguing the term "public purposes" in § 5 includes the purpose of economic development of the community, the County urges our adoption of the more expansive definition of the term "public purpose" as provided in State ex. rel. Brown v. City of Warr Acres, 1997 OK 117, 946 P.2d 1140, which construed that term in the context of public funding pursuant to Art. 10, §§ 14, 17 and 26 of the Oklahoma Constitution. As previously noted in this Opinion, we adhere to the rule of strict statutory construction of eminent domain statutes and reject the County's proposed application of the broader definition of "public purpose" as set forth in Brown.[16]
¶ 14 We recognize the general rule that where legal relief is available on alternative, non-constitutional grounds, we avoid reaching a determination on the constitutional basis. See State ex rel. Fent v. State ex rel. Okla. Water Res. Bd., 2003 OK 29, ¶ 12, 66 P.3d 432, 439. However, the circumstances of this case lead us to the conclusion that it is necessary for us to reach a constitutional determination in addition to our statutory determination. Here, the two determinations are intertwined. The analysis under both the applicable eminent domain statute and under the state constitutional provisions turns on the identical determination of the meaning of the term "public purpose," which we have previously noted in ¶ 9 of this Opinion, is synonymous with "public use" as provided in the Oklahoma Constitution.
¶ 15 Considering the fact that the proposed Eagle Pipeline would be solely dedicated to the purpose of serving a private entity to enable its construction and operation in energy production, it is clear that the County in this case urges a broad interpretation of "public purposes." While arguing the construction of the plant will serve a public purpose by significantly enhancing the economic development of Muskogee County through increased taxes, jobs and public and private investment, County urges our adoption of a rule, which has been applied in other jurisdictions that the exercise of eminent domain for purposes of economic development alone (in the absence of blight) satisfies the constitutional "public use" or "public purpose" requirement.[17] We recognize that the U.S. Supreme Court recently upheld a city's exercise of eminent domain power in furtherance of an economic development plan, holding that economic development satisfied the "public use" restriction in the Fifth Amendment's Takings Clause and finding the city's economic development plan served a "public purpose." Kelo v. City of New London, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005).
¶ 16 In Kelo, the city of New London, Connecticut, a city that had experienced "decades of economic decline,"[18] developed a plan for economic development of the area, *650 which included the acquisition of private property owners' land. The city in Kelo condemned the properties pursuant to Connecticut's Municipal Development Statute, which expressly authorized the use of eminent domain as part of an economic development project. See Conn. Gen.Stat. § 8-186 et seq. In reaching its determination, the Court in Kelo applied its "broader and more natural interpretation of public use as public purpose" pursuant to the Fifth Amendment and noted its cases have defined "public purpose" broadly as a reflection of "[the Court's] longstanding policy of deference to legislative judgments in this field." Id. at 2662-63. The majority in Kelo emphasized its public use jurisprudence has afforded legislatures "broad latitude in determining what public needs justify the use of the takings power." Id. at 2664. Additionally, the Kelo majority declined to "second-guess the City's considered judgments about the efficacy of its development plan" as well as "the City's determinations as to what lands it needs to acquire in order to effectuate the project," and deferred to the legislature as to the amount and character of land to be taken for the project. Id. at 2668 (citation omitted).
¶ 17 The U.S. Supreme Court expressly limited its holding in Kelo as follows: "[t]his Court's authority, however, extends only to determining whether the City's proposed condemnations are for a `public use' within the meaning of the Fifth Amendment to the Federal Constitution." Id. Notably, the Court in Kelo additionally expressly provided as follows:
We emphasize that nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power. Indeed, many states already impose "public use" requirements that are stricter than the federal baseline. Some of these requirements have been established as a matter of state constitutional law, while others are expressed in state eminent domain statutes that carefully limit the grounds upon which takings may be exercised.
Id. (footnotes and citations omitted).
¶ 18 Contrary to the Connecticut statute applicable in Kelo, which expressly authorized eminent domain for the purpose of economic development, we note the absence of such express Oklahoma statutory authority for the exercise of eminent domain in furtherance of economic development in the absence of blight. The statute at issue in the instant cases is a general grant of power that permits condemnation "in like manner as railroad companies, for highways, rights-of-way, building sites, cemeteries, public parks and other public purposes." 27 O.S. § 5; see City of Midwest City v. House of Realty, Inc., 2004 OK 56, ¶ 1, 100 P.3d 678 (characterizing the power in § 5 as a general power of eminent domain and holding that municipality may not use this general power of eminent domain for the purpose of economic development and blight removal when acting jointly with a public trust). County here seeks a broad, expansive interpretation of the term "public purpose" to permit the exercise of eminent domain pursuant to the County's general statutory power of eminent domain. However, we have already rejected such a broad interpretation of "public purpose" as set forth in 27 O.S. § 5 in City of Midwest City, where we noted "a municipality is not possessed with an unfettered discretion to condemn property for economic redevelopment projects outside of the scope of statutory schemes that the Legislature has provided for removal of blighted property." Id. at ¶ 20, 100 P.3d at 685. In that case, we additionally noted the distinction between blight removal and economic development, with "[t]he former [constituting] the public purpose that constitutionally justifies the subsequent sale of the property for private use." Id. at ¶ 22, 100 P.3d at 686. Accordingly, we hold that economic development alone does not constitute a public purpose and therefore, does not constitutionally justify the County's exercise of eminent domain. Pursuant to our own narrow requirements in our constitutional eminent domain provisions found at Art. 2, §§ 23 & 24 of the Oklahoma Constitution, we view the transfer of property from one private party to another in furtherance of potential economic development or enhancement of a community in the absence of blight as a purpose, which must yield to our greater constitutional obligation to protect and preserve the individual fundamental *651 interest of private property ownership.
¶ 19 To the extent that our determination may be interpreted as inconsistent with the U.S. Supreme Court's holding in Kelo v. City of New London, today's pronouncement is reached on the basis of Oklahoma's own special constitutional eminent domain provisions, Art. 2, §§ 23 & 24 of the Oklahoma Constitution, which we conclude provide private property protection to Oklahoma citizens beyond that which is afforded them by the Fifth Amendment to the U.S. Constitution. In other words, we determine that our state constitutional eminent domain provisions place more stringent limitation on governmental eminent domain power than the limitations imposed by the Fifth Amendment of the U.S. Constitution.[19] We join other jurisdictions including Arizona, Arkansas, Florida, Illinois, South Carolina, Michigan, and Maine, which have reached similar determinations on state constitutional grounds.[20] Other states have similarly restricted the government's eminent domain power through state statute.[21]
*652 ¶ 20 While the Takings Clause of the U.S. Constitution provides "nor shall private property be taken for public use without just compensation," the Oklahoma Constitution places further restrictions by expressly stating "[n]o private property shall be taken or damaged for private use, with or without compensation." OKLA. CONST. art. 2, § 23 (emphasis added). That constitutional provision additionally expressly lists the exceptions for common law easements by necessity and drains for agricultural, mining and sanitary purposes. The proposed purpose of economic development, with its incidental enhancement of tax and employment benefits to the surrounding community, clearly does not fall within any of these categories of express constitutional exceptions to the general rule against the taking of private property for private use. To permit the inclusion of economic development alone in the category of "public use" or "public purpose" would blur the line between "public" and "private" so as to render our constitutional limitations on the power of eminent domain a nullity. If property ownership in Oklahoma is to remain what the framers of our Constitution intended it to be, this we must not do.

IV

LANDOWNERS' MOTION FOR APPEAL-RELATED ATTORNEY FEES AND COSTS
¶ 21 Landowners in each of the four instant cases seek an award of their appeal-related attorney fees and costs pursuant to Okla.Sup.Ct.R. 1.14(a) and (b), 27 O.S. § 5 and 66 O.S.2001 § 55. County subsequently filed its Objection to Assessment of Attorney's Fees, arguing that Landowners have incurred no actual attorney fees and expenses in this condemnation proceeding because the Landowners' cost of defense was "defrayed from the land owner by a private organization who [sic] is opposed to the county's authority to acquire this easement." County cites no legal authority in support of its objection to the assessment of attorney fees in this matter.
¶ 22 The general rule is "[a]ppeal-related attorney fees are recoverable if statutory authority exists for their award in the trial court." Casey v. Casey, 2002 OK 70, ¶ 26 58 P.3d 763, 772 (footnotes omitted). Further, the right to recover attorney fees in a condemnation proceeding must be provided by statute. Carter v. City of Oklahoma City, 1993 OK 134, 862 P.2d 77, 79; see Root v. Kamo Elec. Coop., Inc., 1985 OK 8, 699 P.2d 1083 (permitting condemnees' recovery of attorney fees against a rural electric cooperative pursuant to 66 O.S.1981 § 55(D)). Title 27 O.S. § 5 provides in pertinent part, "[a]ny county . . . shall have power to condemn lands in like manner as railroad companies.. . ." Id. Title 66 O.S.2001 § 51 et seq. is the statutory scheme applicable in condemnation proceedings instituted by railroad companies and provides the applicable method of procedure for eminent domain proceedings brought pursuant to 27 O.S. § 5. See Harn v. State ex rel. Williamson, 1939 OK 40, 87 P.2d 127, 129. We hold that 66 O.S. 2001 § 55(D)[22] applies to the instant cases to permit reimbursement to the prevailing Landowners for their reasonable appeal-related *653 attorney fees upon a requisite showing before the trial court on remand that attorney fees have been actually incurred by Landowners because of the condemnation proceeding. See 12 O.S. Supp.2004 § 696.4(C.) (providing that "[t]he appellate court shall decide whether to award attorney fees for services on appeal, and if fees are awarded, it shall remand the case to the trial court for a determination of their amount."). Therefore, Landowners' Motion for Appeal-Related Attorneys' Fees is GRANTED to the extent the Landowners have demonstrated the requisite statutory authority for the recovery of appeal-related attorney fees and we hereby REMAND to the trial court for a determination of "such sum as in the opinion of the court will reimburse [Landowners] for [their] reasonable attorney . . . fees actually incurred because of the condemnation proceeding" in accordance with 66 O.S. § 55(D).
¶ 23 Landowners' Motion for Appeal-Related Costs was "separately filed and labeled" and included an attached verification including taxable cost items[23] in accordance with Okla.Sup.Ct.R. 1.14(a). Landowners are entitled to recover "costs on appeal" pursuant to 12 O.S.2001 § 978, since the trial court's judgment against them was reversed in this case. Sunrizon Homes, Inc. v. American Guar. Inv. Corp., 1988 OK 145, 782 P.2d 103, 109.
¶ 24 Landowners seek recovery of the $100.00 fee for designation of the record, which is a fee paid to the district court and is not recoverable in this court. See Spears v. Shelter Mut. Ins. Co., 2003 OK 66, ¶ 15, 73 P.3d 865, 871. Otherwise, Landowners seek recoverable review-and-certiorari-related costs. Thus, Landowners' Motion to tax review-and-certiorari-related costs shall be GRANTED IN PART in the amount of $288.16 to the Lowery Landowners in matter # 98,361, $288.16 to the Whitten Landowners in # 98,362 and $288.16 to the Hyslope Landowner in # 98,363 respectively, and in the amount of $200.00 to the Hobbs Landowners in # 98,531.

V

SUMMARY
¶ 25 Although we recognize the COCA correctly determined that economic development alone did not constitute "public purpose" within the meaning of 27 O.S. § 5, we vacate the COCA's opinion in order to make a determination of first impression. We hold the takings in the four instant cases are unlawful takings of Landowners' private property to confer a private benefit on a private party, Energetix, in violation of Article 2, §§ 23 & 24 of the Oklahoma Constitution. We further hold that takings for the purpose of economic development alone (not in connection with the removal of blighted property) do not constitute a public use or public purpose to support the exercise of eminent domain as a matter of Oklahoma constitutional *654 law, nor does it satisfy the public purpose requirement of 27 O.S.2001 § 5. Further, we grant Landowners' Motion for Appeal-Related Attorneys' Fees. Appellants' Motion for Appeal-Related Costs is granted in part.
¶ 26 Upon certiorari previously granted,
THE COURT OF CIVIL APPEALS' OPINION IS VACATED; THE DISTRICT COURT'S JUDGMENT IS REVERSED AND THE CAUSE IS REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH TODAY'S PRONOUNCEMENT; APPELLANTS' MOTION FOR APPEAL-RELATED ATTORNEYS' FEES IS GRANTED; APPELLANTS' MOTION FOR APPEAL-RELATED COSTS IS GRANTED IN PART.
¶ 27 LAVENDER, HARGRAVE, OPALA, KAUGER, JJ., and CHAPEL, S.J. (sitting by designation in lieu of COLBERT, J.), concur.
¶ 28 TAYLOR, J., concurring in result.
¶ 29 WATT, C.J., concurs in part, dissents in part.
¶ 30 WINCHESTER, V.C.J., and EDMONDSON, J., dissent.
¶ 31 COLBERT, J., disqualified.
OPALA, J., concurring.
¶ 1 "No private property shall be taken or damaged for private use, with or without compensation, unless by consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining, or sanitary purposes in such manner as may be prescribed by law." [Emphasis supplied] Art. 2 § 23, Okl. Const.
¶ 2 Private property may be taken (or damaged) for public use only upon payment of just compensation. Art. 2 § 24, Okl. Const.
¶ 3 The question before us is whether Muskogee County may exercise its power of eminent domain to acquire for Energetix rights in land upon which a rural pipeline will be laid to convey water for generation of electricity. Energetix is a private for-profit corporation that is not a public utility. I agree with the court and with Taylor, J., writing separately, that the land is not sought for public but rather for private use in violation of Art. 2 § 24, Okl. Const., which disallows condemnation of private property for nonpublic use.
¶ 4 When the government proposes to take a person's property to build streets, jails, government buildings, libraries or public parks that the government will own or operate, the anticipated use is unquestionably public. If the government proposes to take property and then convey it to private developers for private commercial use, a significant question is presented by the intended disposition of the property to be taken. The Oklahoma Constitution requires that the anticipated public benefits substantially outweigh the private character of the end use so that it may truly be said that the taking is for use that is "really public". The state constitutional requirement which limits the exercise of eminent domain power to "public use" is satisfied only when the public benefits and characteristics of the intended use substantially predominate over the private value of that use. Bailey v. Myers, 206 Ariz. 224, 76 P.3d 898, 904. The essential element of predominance is absent from this record.
¶ 5 Because the intended taking has not been shown to be for public use, I concur in the court's opinion and in the pertinent part of Taylor, J.'s separate writing.
TAYLOR, J., concurring in result.
¶ 1 Although I agree with the majority opinion's result, my agreement is not unqualified. I agree that title 27, section 5 does not give Muskogee County the authority to take the plaintiffs' property in this case. See Majority Op. at ¶¶ 12-14. Because Muskogee County's exercise of eminent domain is not authorized by title 27, section 5, it is unnecessary to resort to a constitutional analysis and such analysis is "deemed precluded by a self-erected `prudential bar' of restraint." See State ex rel. Fent v. State ex rel. Okla. Water Res. Bd., 2003 OK 29, ¶ 12, 66 P.3d 432, 439. Only because a majority of this Court has relied on Oklahoma's Constitution *655 as a basis for its decision, I write separately on the issue of whether Muskogee County's use of eminent domain is valid under Article 2, Section 23 of the Oklahoma Constitution.
¶ 2 Article 2, Section 23 provides:
No private property shall be taken or damaged for private use. . . . The test under this provision is whether the primary reason for the exercise of the power of eminent domain serves a public purpose. If so, the condemnation complies with this provision of article 2, section 23 of the Oklahoma Constitution, even if an ancillary private benefits enures. See Isaacs v. Oklahoma City, 1966 OK 267, 437 P.2d 229. On the other hand, if the primary reason for the exercise of the power of eminent domain is to serve a private interest and the public purpose is incidental, then the taking of private property is constitutionally invalid. Midwest City v. House of Realty, Inc., 2004 OK 56, ¶ 22, 100 P.3d 678, 686.
¶ 3 In the briefs on appeal, the appellees rely only on the public benefits of increased taxes, jobs, and public and private investment which will result from the Energetix plant as justifying the taking of private property for Energetix's water pipelines. They do not rely on any benefit resulting from the additional rural water pipeline. The primary reason for taking plaintiffs' property is to benefit Energetix by reducing its expense of laying its waterlines. Energetix is a for-profit company and not a public utility. It is not regulated by the Oklahoma Corporation Commission. Energetix generates electricity for one customer, not the public. The electricity produced by Energetix is not distributed based on needs of people of Muskogee County but based on Energetix's business interests. The primary reason for Muskogee County's condemning plaintiffs' property is to benefit Energetix which is a private use. Any benefits to Muskogee County are ancillary.
¶ 4 I emphasis the facts here are not analogous to taking private property to eliminate blight. See 11 O.S.2001, § 38-111 (giving the Urban Renewal Authority the right of eminent domain and declaring condemnation for renewal of blighted areas to be a public use). This Court has recognized that freeing an area of blight serves the public purpose necessary for the legitimate exercise of eminent domain powers. The benefit to private interest in the condemned property after the elimination of undesirable conditions is incidental to the public purpose. Midwest City, 2004 OK 56 at ¶ 22, 100 P.3d at 686.
¶ 5 Likewise, these facts are not analogous to a municipality or a rural water district taking private property for waterlines for its waterworks system. See 11 O.S.2001, §§ 22-104, 37-117; 82 O.S.2001, § 1324.10(17). In the case of a municipality or a rural water district exercising the power of eminent domain for waterlines as part of its waterworks system, the municipality and the rural water district retain control of the waterlines' use and, if they choose, can utilize the waterlines to supply water to other customers. See Shell Petroleum Corp. v. Town of Fairfax, 1937 OK 401, ¶ 23, 69 P.2d 649, 652 (provision conferring power upon cities to condemn and appropriate land for waterworks purposes was not repugnant to any provision of the Constitution). This case is more akin to a county condemning private property for the benefit of a private entity who wants to improve the property to increase the entity's income, and, as an ancillary benefit, taxes increase.
¶ 6 The plaintiffs would have us believe that this is a case of a wealthy corporation which "wants the land of his poorer neighbors and influences local power to force the neighbors to sell or be forced off their land." In fact, Muskogee County seeks a thirty-foot easement next to a county road, the waterlines would be underground, the plaintiffs would be compensated for the easement, it appears the easement would have very little impact on the plaintiffs' use of their land, and there is little danger in harm occurring from the waterlines. Muskogee County has a legitimate interest in bringing new business to the county and, thereby, increasing taxes and jobs. However, this interest does not legitimize Muskogee County's exercise of its power of eminent domain to primarily benefit Energetix.
¶ 7 An award of attorney fees may be dictated under the rule of stare decisis. *656 However, any award of attorney fees to the landowner should be granted ONLY if the landowners prove they were unequivocally and contractually obligated to pay attorney fees at the time the legal services were rendered and that the landowners have actually paid the fees. If the landowners have not incurred attorney fees or if the landowners were not contractually obligated to pay attorney fees, then they are not entitled to an award of attorney fees. If the landowner's fees and costs of defense were defrayed by a private organization, then the landowner is not entitled to any award of attorney fees and costs.
¶ 8 Without joining in the Court's constitutional analysis, I nevertheless concur in this Court's holding that Muskogee County's exercise of its power of eminent domain was statutorily unauthorized. For the above reasons, I concur in the result.
EDMONDSON, J., Dissenting and joined by WINCHESTER, V.C.J.
¶ 1 The Court's decision reflects an understandable sensitivity to the United States Supreme Court's recent approval in Kelo v. City of New London of a municipal exercise of eminent domain to take unblighted private residential property and deliver it to a private business in anticipation of public benefits to be derived solely from economic development.
¶ 2 In Oklahoma, our State Constitution extends greater protection to private property than does the Federal Constitution, as the majority opinion ably demonstrates. It also mandates that no private property be taken without just compensation.
¶ 3 However, I do not believe our greater measure of safety for private property was intended to deny non-riparian neighbors access to state water resources; particularly when the water is abundant, access can be achieved merely by taking an easement and is essential to the neighbor's survival, and the purpose is, as here, to expand electrical power resources in an economy in which energy is in critically short supply.
¶ 4 No one should be denied access to public water resources unless it is demonstrated that the access would impair the welfare of the public itself. New generation of electrical power is legislatively favored though it be by a private company and marketed directly to a private consumer, because it contributes to the national energy pool and to the ultimate benefit and security of the public. See 27 O.S., §§ 4, 7.
¶ 5 Finally, I am not convinced that eminent domain attorney fees awarded against the county, and thus against the people in the county, can be justified by piggybacking the railroad condemnation statutes. In my view, for an award of attorney fees to be authorized, the authorization must be found within the strict confines of the involved statutehere, 27 O.S. § 5and not merely within condemnation statutes generally. See Head v.McCracken, 2004 OK 84, ¶ 14, 102 P.3d 670, 680; Beard v. Richards, 1991 OK 117, 820 P.2d 812, 816; Carter v. City of Oklahoma City, 1993 OK 134, 862 P.2d 77, 80.
¶ 6 With these reservations in mind, I respectfully dissent.
NOTES
[1] The Landowners/Defendants/Appellants in the four subject cases are as follows: Edward L. Lowery and Mary L. Lowery, Husband and Wife (case no. 98,361); Jack E. Whitten and Doris M. Whitten, Husband and Wife (case no. 98,362); Richard Hyslope (case no. 98,363); Paul Hobbs and Diann Hobbs, Husband and Wife (case no. 98,531).
[2] Rural Water District No. 5 was originally named as a Defendant in each of the four subject cases. The record reflects that at least some of the subject properties sought to be condemned in these cases were subject to pre-existing Water District Easements. The County ultimately dismissed the Water District from the cases because County did not seek to acquire an interest in and to the Water District's easements. Water District filed a Disclaimer in the District Court disclaiming any interest in the Commissioners' Award in the condemnation action because the County was not seeking to take any property of the Water District and therefore, the Water District will have sustained no injury by way of County's attempted condemnation.
[3] This contract was attached as Deposition Exhibit # 1 to the August 27, 2002 transcript of the deposition of Ray Mize, the co-owner of Energetix.
[4] The contract (at paragraph 3, page 2 thereof) further specifies Energetix's duty to construct the Water District Pipeline is subject to satisfaction of the additional following conditions precedent: Energetix's attainment of all necessary permits and affirmatively determining at its sole discretion, to construct the Eagle Pipeline; the Water District and Energetix's written agreement as to plans and specifications of the Water District Pipeline and hydrants as well as a construction materials list; Water District's obligation to provide all the materials on the materials list to the Energetix contractor at least fifteen days prior to construction of the Eagle Pipeline; Water District or Energetix's success in obtaining all necessary permits to build the Water District Pipeline and hydrants prior to commencement of the Eagle Pipeline; receipt by each party of written consents by the other party to the plans of each other's facilities, as needed to eliminate any question of either party unreasonably interfering with the other party's use of its easements.
[5] The Commissioners were required to file an Amended Report in each case because after the filing of the initial Commissioners' Report, Landowners' Exceptions included an objection on the basis that the report did not properly apportion the compensation award between the Landowner and the Rural Water District No. 5, which was at that time a defendant in the lawsuits due to the Water District's pre-existing easements on the subject properties. Subsequent to Landowner's objection, the County dismissed the Water District from the lawsuits because its preexisting easements were not subject to condemnation here and thus, the Water District was not entitled to compensation. The district court entered an order determining that as a result of the dismissal of the Water District as a defendant, the Landowners' Exception as to appropriate apportionment of the compensation award was rendered moot and reappointed Commissioners to reassess the amount of just compensation due to the remaining Defendants. The amounts listed (as compensation due Landowners for the respective takings of their property) in the Amended Commissioners Report were the identical amounts as previously listed in the initial Commissioners' Report.
[6] The amount of compensation determined to be awarded to Landowners for the takings as set forth in the Amended Commissioners' Report in each case was as follows: $6,260 to Lowery Landowners (# 98,361); $17,850 to Whitten Landowners (# 98,362); $35,640 to Hyslope Landowners (# 98,363); $11,120 to Hobbs Landowners (# 98,531).
[7] County argued below that Landowners failed to comply with the requisite statutory procedure (as set forth in 66 O.S.2001 § 55) as to the proper and timely filing of Landowners' Exceptions to the Commissioners' Report. In each case, an Amended Commissioners' Report was filed (due to Landowners' objection that the initially filed Commissioners' Report had failed to apportion the amount of compensation due to Landowners versus the amount due the Defendant Water District for the takings). In the first three instant cases, County argued Landowners had waived their right to file exceptions or otherwise object to the takings because although Landowners had timely filed Exceptions to the initial Commissioners' Report, Landowners failed to re-file their Exceptions subsequent to the filing of the Amended Commissioners' Report (which was identical in content to that of the initial report filed in each respective case). The record contains some evidence that Landowners' attorney of record did not receive copies of the Amended Commissioners' Report filed in these cases from the District Court Clerk until after the thirty day deadline had expired. (Transcript of Hearing of August 22, 2002, pp. 17-18). In the fourth case (the Hobbs matter, # 98,531), while the County initially raised a similar claim regarding Landowners' waiver of their right to file exceptions due to the alleged untimely filing of the Landowners' Exceptions, it appears that the County ultimately withdrew this claim before the trial court and abandoned this issue as to the Hobbs matter. (Transcript of Hearing of September 27, 2002, p. 8). The COCA ultimately rejected the County's claim in each of the four cases and determined the Landowners had not waived their statutory right to object to the takings. Despite the County's loss on this issue before the COCA, the County failed to present it in its Petition for Certiorari. Although County attempts to preserve this issue in the penultimate paragraph in its supplemental brief on certiorari, the County's failure to present this issue in its Petition for Certiorari is fatal to its preservation for review on certiorari. See Okla. Sup.Ct. R. 1.180; Hough v. Leonard, 1993 OK 112, 867 P.2d 438; see also Jackson v. Jackson, 2002 OK 25, n. 12, 45 P.3d 418 (noting "[g]enerally, this Court will not review issues decided by the COCA adversely to a party that are not re-tendered for review on certiorari"). But see Patterson v. Beall, 2000 OK 92, ¶ 1, n. 1, 19 P.3d 839 (noting that while a party's attempt to raise an issue in the party's supplemental brief on certiorari without first expressly raising the issue in his petition for certiorari fails to preserve error, this Court may review claims relating to alleged deprivations of due process of law despite that party's failure to preserve error).
[8] Prior to the hearing for oral argument on certiorari, the parties in the Hobbs matter (# 98,531) were ordered to present additional supplementary briefs to specifically address the following question: "Is providing access to a water supply for a private entity sufficient to satisfy the public purpose requirement of 27 O.S.2001 § 5, thereby allowing the use of the county's condemnation power to take an easement from private property owners?"
[9] The U.S. Constitution generally provides in pertinent part as follows: "No person shall be. . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. CONST. Amend. V. The Fifth Amendment to the U.S. Constitution is made applicable to the States by the Fourteenth Amendment.
[10] The express constitutional eminent domain provisions have similarly led to the converse determination that the government is prohibited from taking property for the purpose of conferring a private benefit on a particular private party. Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984); see City of Pryor Creek v. Pub. Serv. Co., 1975 OK 81, 536 P.2d 343, 346 (noting "to hold otherwise would amount simply to the taking of property from one and . . . giving it to another without any benefit to the public").
[11] We have previously determined the constitutionality of redevelopment statutes that permitted takings for the combined purposes of blight removal and economic development and upheld such takings even where such statutes authorize private use of the property after blighted conditions are removed. See, e.g., Isaacs v. City of Oklahoma City, 1966 OK 267, 437 P.2d 229, cert. denied, 389 U.S. 825, 88 S.Ct. 63, 19 L.Ed.2d 79 (1967). We identified the public use or public purpose in Isaacs as slum or blighted area clearance and said the fact that private parties who might acquire ownership of the property after blight clearance "is merely incidental to the main legislative purpose." Id. at 234. There has been no allegation in the instant cases that any of the subject properties are blighted or otherwise in poor condition. Here we are determining whether economic development alone is a public purpose to justify the exercise of eminent domain. We note that our pronouncement today does not disturb the rule in Isaacs.
[12] We note another critical distinguishing feature of Oklahoma courts' determination of "public purpose" in public funding cases from the instant eminent domain matters, which leads us to adhere to a strict construction of the term "public purpose" in the context of eminent domain. In public funding cases, courts are required to give great deference to the legislature's determination whether a particular project will serve a public purpose. See State ex rel. Brown v. City of Warr Acres, 1997 OK 117, ¶ 18, 946 P.2d 1140, 1144. In contrast, the Oklahoma Constitution expressly provides "in all cases of condemnation of private property for public or private use, the determination of the character of the use shall be a judicial determination." OKLA. CONST. art. 2, § 24 (emphasis added). The U.S. Supreme Court has concluded this judicial determination is "extremely narrow," and "[o]nce the question of the public purpose has been decided, the amount and character of the land to be taken and need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 104, 99 L.Ed. 27 (1954). In construing the constitutionality of a state's eminent domain statute authorizing such power for the purpose of economic development specifically pursuant to the Federal Takings Clause, the U.S. Supreme Court recently emphasized its great deference to the legislature "in determining what public needs justify the use of the takings power." Kelo v. City of New London, 545 U.S. 469, ___, 125 S.Ct. 2655, 2664, 162 L.Ed.2d 439 (2005).
[13] See Southwestern Illinois Dev. Auth. v. Nat'l City Envtl., 199 Ill.2d 225, 263 Ill.Dec. 241, 768 N.E.2d 1, 11 (2002), cert. denied, 537 U.S. 880, 123 S.Ct. 88, 154 L.Ed.2d 135 (2002) (noting pursuant to the Illinois Constitution's eminent domain provision that while the term "public purpose" is not a static concept, economic development alonein the absence of a showing the taking is for purposes of eliminating slums or blightdoes not constitute "public purpose" and concluding "[t]he power of eminent domain is to be exercised with restraint, not abandon").
[14] The record reflects that at the time the County filed its Petition in these matters and throughout the discovery process, additional facts were presented to the trial court supportive of the argument that the statutory and constitutional "public purpose" requirement was met. In addition to the economic development purpose, the County's additional basis for establishing the "public purpose" requirement was the proposed third Water District pipeline (intended to serve the rural residents of the community with expanded water service), which Energetix had contractually agreed (in its contract with the Water District) to construct on behalf of the Water District on the condition precedent that Energetix was successful in its acquisition of all the necessary rights-of-way for construction of the Eagle Pipeline (the two pipelines that solely serve the private company, Energetix). The record reflects Energetix presented this proposed plan to construct the Water District Pipeline to the County Commissioners in support of its effort to convince the County that there was a direct public benefit with the increased rural water service to members of the rural community and thus, "public purpose" to support the County's exercise of eminent domain power. We note that given the fact of the condition precedent to Energetix's duty to construct the Water District Pipeline, it is apparent that members of the public, who might have enjoyed the benefits of rural water service, are not the primary intended beneficiaries of the proposed takings, as they would only enjoy those benefits on the condition that the property was acquired for the private Eagle Pipeline purposes in the first instance. The Water District Pipeline basis was apparently abandoned on appeal, as the County does not argue in any of its appellate submissions the Water District Pipeline as a basis for satisfaction of the requisite "public purpose" test, but rather, argues economic development as its sole basis for satisfying that test. We note that even if the Water District Pipeline rationale had not been abandoned, the facts relative to the proposed Water District Pipeline do not support the conclusion that there is a public purpose to support the County's exercise of eminent domain. The condition precedent in the contract operates in such a way that Energetix's duty to construct the Water District Pipeline never arisesand thus, the Water District Pipeline proposed to serve the general public never comes into existenceunless and until Energetix's successful attainment of all rights-of-way necessary for construction of the private Eagle Pipeline. It is clear that the Eagle Pipeline alone would serve and benefit only one private entity and therefore, it fails to satisfy the "public purpose" test. Although the Water District Pipeline might have individually met the public purpose test had the Water District sought to exercise its own power of eminent domain (pursuant to 82 O.S.2001 § 1324.10), the Water District refrained from doing so in this case. In fact, the contract expressly states the Water District lacked the funds to build the Water District Pipeline. It is clear that the Water District could not contract away, surrender or alienate its own eminent domain power to another entity, as the right of eminent domain is inalienable. Burke v. Oklahoma City, 1960 OK 29, 350 P.2d 264; see also Ponca City v. Drummond, 1923 OK 1112, 221 P. 466 (noting the rule that where property is taken for a particular public purpose, such right of way or easement is limited to the purposes of the same character of the original public use); 82 O.S. § 1324.10(16) (providing the Water District's right of eminent domain "shall be restricted to the purpose of developing and providing rural gas distribution, water works and sewage disposal facilities."). Given these authorities, we are bound to consider the proposed Water District Pipeline easement separately and independently given the distinct character of its use from that of the Eagle Pipeline and the express statutory restriction on the Water District's eminent domain power to the purpose of the "developing and providing rural . . . water works." 82 O.S. § 1324.10(16). Certainly the County cannot, pursuant to a general statutory eminent domain power, exercise its eminent domain power on behalf of the Water District beyond that express statutory restriction against the Water District itself, which limits its eminent domain power to the purposes of the rural gas, water and sewage service. In reaching our determination of "public purpose" here, we are constrained by the terms of the contract, which never give rise to public purpose unless and until the condition precedent of successful acquisition of land for construction of the private Eagle Pipeline is satisfied. If we were to find the public purpose test satisfied on these facts, we would essentially be first permitting the taking of private property for a private use in order to give rise to a private, non-party's contractual obligation to construct a pipeline that would ultimately satisfy the public purposes requirement. The law does not support such a cart-before-the-horse type extension of the County's general eminent domain power.
[15] The County additionally asserts (in its Petition filed in the trial court in addition to its appellate briefs) that Energetix is a public utility and that the rule set forth in Tuttle v. Jefferson Power & Improvement Co., 1912 OK 232, 122 P. 1102 is applicable in these cases. In Tuttle, this Court held that the generating, storing and distribution of electricity for the use of all who may have need of it, upon equal and reasonable terms is a public use so as to justify the power company's exercise of its power of eminent domain as expressly conferred by state statute. Id. at 1103 (emphasis added). County asserts that the business of generating electricity alone constitutes a public purpose. There is no evidence in the record that Energetix plans to supply power or electricity to members of the public who need it upon equal and reasonable terms. Rather, the record reflects Energetix is a private energy company called a "merchant plant," which planned to operate pursuant to energy management service agreements, whereby an energy marketer would supply Energetix with natural gas, Energetix would convert the natural gas into electricity and deliver the electricity to the energy marketer, which would then sell the electricity in the market. (Depo. T. of Ray Mize, August 27, 2002, p. 15-17). Additionally, the record reflects the owner of Energetix did not believe Energetix itself had the right to exercise the power of eminent domain. (Depo. T. of Ray Mize, August 27, 2002, p. 21-22). A reasonable inference from this acknowledgment is that Energetix itself did not consider itself a public utility because if it had, it would have exercised its own eminent domain power as a public utility (pursuant to express statutory authority) as opposed to seeking the County's exercise of eminent domain power on its behalf. The record is unclear as to the identity of the end user or users of the electricity product to be sold by the energy marketer upon Energetix's production and sale to the marketer (i.e., we are unable to discern whether the finished electricity product will ultimately be offered to the public at large and/or whether such product will ultimately be sold out of state). We determine that Energetix is a private power company and not a public utility, and therefore deem the rule in Tuttle inapplicable here. Additionally, the County cites case law outside this jurisdiction in support of the general proposition that a private entity in the business of generating electricity "has been universally held by all Courts to be a public purpose." We reject this proposition to the extent it is inconsistent with our limited holding in Tuttle.
[16] We note that we are not alone in determining there is a distinction between "public purpose" in the context of eminent domain cases as opposed to public funding cases. See, e.g., Georgia Dep't of Transp. v. Jasper County, 355 S.C. 631, 586 S.E.2d 853, 856 (2003) (noting "public purpose" in the context of tax cases and bond revenue cases is not the same as in the context of eminent domain proceedings in that "public purpose" is narrowly defined in the latter proceedings).
[17] See, e.g., Kelo v. City of New London, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) (upholding a Connecticut state statute expressly authorizing the exercise of the power of eminent domain in furtherance of economic development pursuant to the Takings Clause in the Fifth Amendment to the U.S. Constitution).
[18] There was no allegation in Kelo that the properties sought to be condemned were blighted. Kelo, 125 S.Ct. at 2660.
[19] "[T]he Oklahoma Constitution can afford rights greater than those granted by the United States Constitution." Eastern Oklahoma Bldg. & Constr. Trades Council v. Pitts, 2003 OK 113, n. 2, 82 P.3d 1008 (citing Turner v. City of Lawton, 1986 OK 51, ¶ 10, 733 P.2d 375, 378, cert. denied, 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987)). Our holding in the instant cases concerns state constitutional questions based on Oklahoma law, which constitutes "separate, adequate, and independent [state] grounds" for our decision. See Michigan v. Long, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).
[20] See, e.g., Southwestern Illinois Dev. Auth. v. Nat'l City Envtl., 199 Ill.2d 225, 263 Ill.Dec. 241, 768 N.E.2d 1 (2002), cert. denied, 537 U.S. 880, 123 S.Ct. 88, 154 L.Ed.2d 135 (2002) (holding a taking for economic development alone would not achieve a legitimate public use and was unconstitutional pursuant to Art. 2, § 15 of the Illinois Constitution, which generally provides private property shall not be taken or damaged for public use without just compensation to its owner.); County of Wayne v. Hathcock, 471 Mich. 445, 684 N.W.2d 765 (2004) (determining condemnations for purposes of economic development are unconstitutional because they do not advance a public use as required by Art. 10, § 2 of the Michigan Constitution, which generally provides "[p]rivate property shall not be taken for public use without just compensation. . . ."); Bailey v. Myers, 206 Ariz. 224, 76 P.3d 898, 901 (Ariz.App. Div. 1, 2003)(holding city's taking of property was not for "public use" in accordance with the "significant limitations on the power of eminent domain provided by Article 2, § 17 of the Arizona Constitution."). We note that Article 2, § 17 of the Arizona Constitution is virtually identical to Article 2, § 23 of the Oklahoma Constitution. Article 2, § 17 of the Arizona Constitution provides in pertinent part as follows: "[p]rivate property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches, on or across the lands of others for mining, agricultural, domestic, or sanitary purposes." Id. See also Karesh v. City of Charleston, 271 S.C. 339, 247 S.E.2d 342, 345 (1978) (noting its express adherence to a "strict interpretation" of [Art. 1, § 13 of the South Carolina Constitution, which restricts the power of eminent domain to the taking of private property for "public use"] and determining condemnation of land and leasing same to a private corporation for construction of a parking facility and convention center is an unconstitutional taking of property for a private use despite incidental benefit to the public); City of Little Rock v. Raines, 241 Ark. 1071, 411 S.W.2d 486 (1967)(determining takings for the purpose of "industrial development" do not satisfy the state constitutional public use limitation pursuant to Art. 2, §§ 22 & 23 of the Arkansas Constitution); Baycol v. Downtown Dev. Auth., 315 So.2d 451, 457 (Fla.1975) (construing Art. 1, § 2 of the Florida Constitution as prohibiting the exercise of eminent domain for a predominantly private use in a case where there was no showing of public need for the subject parking facilities contemplated in the proposed private development project); Opinion of the Justices of the Supreme Judicial Court, 152 Me. 440, 131 A.2d 904, 907 (1957)(holding a proposed Maine statute authorizing eminent domain for the purpose of "industrial development . . . for the betterment of the economy of the city" was an unconstitutional taking for private use and not a public purpose pursuant to Art. 1, § 21 of the Maine Constitution, which provides "private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it.").
[21] For example, in California, a state statute declares "the redevelopment of blighted areas and the provisions for appropriate continuing land use and construction policies in them constitute public uses and purposes for which public money may be advanced or expended and private property acquired." Cal. Health & Safety Code Ann. §§ 33037. Additionally, the California Code of Civil Procedure, § 1240.020 provides the "power of eminent domain may be exercised to acquire property for a particular purpose only by a person authorized by statute to exercise the power of eminent domain to acquire such property for that use." Id. (emphasis added). Based upon the legislative declaration that redevelopment of blighted areas constitutes public use, California courts have construed this statute as providing that cities have the power of eminent domain for economic development purposes specifically limited in the context of blighted areas. See Redevelopment Agency v. Rados Bros., 95 Cal. App.4th 309, 115 Cal.Rptr.2d 234 (2002); See also Carolina Water Serv., Inc. v. Lexington County Joint Mun. Water & Sewer Comm'n, 367 S.C. 141, 625 S.E.2d 227, 232-33 (S.C.Ct.App., 2006) (noting the longstanding rule in South Carolina that the term "public use" is a "broad, elastic term" and "[l]egislative determinations that a contemplated use is necessary, permanent, and public are presumptively valid unless sham or fraud can be shown." Id. (citations omitted)).
[22] This provision provides in pertinent part as follows:

Where the party instituting a condemnation proceeding abandons such proceeding, or where the final judgment is that the real property cannot be acquired by condemnation . . . then the owner of any right, title or interest in the property involved may be paid such sum as in the opinion of the court will reimburse such owner for his reasonable attorney, appraisal, engineering, and expert witness fees actually incurred because of the condemnation proceeding. The sum awarded shall be paid by the party instituting the condemnation proceeding.
66 O.S.2001 § 55(D).
[23] Landowners' motion in three of the instant cases (Lowery, # 98,361; Whitten, # 98,362; Hyslope, # 98,363) includes their attorney's affidavit verifying the following itemization of "appeal related court costs": the "Petition in Error filing fee," which we interpret to mean Landowners seek recovery of the item more specifically referred to as the "deposit to cover costs," or also generally referred to as the "filing fee," in the amount of $200.00 as required by 20 O.S. 2001 § 15. Additionally, the verified statement lists the fee paid to the Muskogee County Court Clerk for the Designation of Record in the amount of $100.00 and the fee paid to the court reporter for preparation of transcripts for the Record in the matter in the amount of $88.16.

With the exception of the $100.00 fee for designation of the record (which is a fee paid to the district court that is not recoverable in this Court) these items listed in the verified statement are recoverable review-and-certiorari-related costs. See Spears v. Shelter Mut. Ins. Co., 2003 OK 66, ¶ 15, 73 P.3d 865, 871; Sunrizon Homes, Inc. v. American Guar. Inv. Corp., 1988 OK 145, 782 P.2d 103; Holleyman v. Holleyman, 2003 OK 48, ¶ 2-3, 78 P.3d 921, 940-41(Opala, V.C.J., Supplemental Opinion after rehearing's denial) (explaining that Rule 1.14(a) regulates the enforcement procedure of 12 O.S. § 978 and these provisions mandate the prevailing party's recovery of taxable costs including court reporter expenses at the conclusion of appellate litigation); 12 O.S.2001 § 978. The total amount of taxable cost items is $288.16 in each of the three cases (# 98,361, # 98,362 and # 98,363). Landowners in the Hobbs matter (# 98,531) list in their attached verified statement of taxable cost items only the first two items (the $200.00 deposit to recover costs/filing fee and the $100.00 non-recoverable record fee). Therefore, the total amount of recoverable costs in Hobbs (# 98,531) is $200.00.